WEESSIES *v.* VAN DYKE'S ESTATE.

APPEAL OF HOEK.

1. ESTATES OF DECEDENTS—EXECUTORS AND ADMINISTRATORS—
ALLOWANCE OF CLAIMS—SERVICES OF MEMBER OF FAMILY.
    The presumption of law that services rendered by a member of
    decedent's family were rendered gratuitously for the common
    benefit, does not bar a claim by a son-in-law for board fur-
    nished his wife's deceased father, who lived in a separate home
    on the premises, if the jury find that the parties understood
    that compensation should be made.[1]

2. WITNESSES—COMPETENCY—STATUTES—FACTS EQUALLY WITHIN
KNOWLEDGE OF DECEASED.
    The claimant's wife who cooked food for her father and assisted
    in caring for him is not an agent of the claimant in making
    or continuing the contract, under Act No. 30, Pub. Acts 1903,
    which excludes the testimony of the agent.

Error to Kalamazoo; Knappen, J. Submitted Novem-
ber 8, 1909. (Docket No. 178.) Decided December 10,
1909.

Harm Weessies presented a claim against the estate of
Harm Van Dyke, deceased, for services rendered. The
claim was allowed in part by the commissioners, and
Walter Hoek, executor, appealed to the circuit court. A
judgment for contestant on a verdict directed by the
court is reviewed by claimant on writ of error. Reversed.

*Osborn & Mills*, for appellant.

*John J. Hollander*, for appellee.

OSTRANDER, J. Appellant presented the following
claim against the estate of Harm Van Dyke, deceased:

---

[1] As to implied contract to pay for services to relative not living
as part of same family, see note to *Mark* v. *Boardman* (Ky.), 1 L.
R. A. (N. S.) 819.

"For board, washing, care, etc., of Harm Van
    Dyke, six years preceding his decease, at $4_ _  $1,248 00
"For extra services and care of said Harm Van
    Dyke during the last year of his life, after he
    was stricken with paralysis, and during his
    last sickness _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _     104 00
"For rent of lot, taxes, and insurance paid and
    incurred for Harm Van Dyke during the last
    six years of his life _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _     150 00
                                                           $1,502 00"

    The commissioners on claims allowed the sum of $1,000.
The executor, upon the demand of a legatee, took an ap-
peal to the circuit court, where a verdict for the estate was
directed.   A motion for a new trial was made, and was
denied, whereupon a judgment was entered upon the ver-
dict with the direction to certify the same to the probate
court.   The principal question presented is whether there
was testimony from which the jury might have found
that the deceased expressly or impliedly contracted to pay
for services and for board and washing furnished by the
appellant during the six years preceding his death.   Harm
Van Dyke died November 28, 1906, at the age of 89 years.
Appellant is his son-in-law—the husband of his daughter.
The testimony tends to prove that for 20 years prior to his
death Harm Van Dyke lived alone in a small two-room
house which he had built with his own money on the lot
belonging to the appellant, only about four or five feet
from the house of the appellant.   Prior to that time, he
had for some years been a member of the family of the
appellant, living in the house with his daughter and her
husband.   For a while after he built his house he took his
meals at the house of appellant, but because he did not
agree with a hired man, and because he was annoyed by
appellant's children, he withdrew himself.   Thereafter
meals were taken by appellant, his wife, or their children
to his cottage, and there the deceased was cared for dur-
ing his life and during his last illness by appellant and his
wife, assisted to some extent during his last sickness by

the neighbors. The deceased bought his fuel, hired his washing done when the wife of appellant was unable to do it, and bought for himself some minor supplies, such as tea, sugar, tobacco, bread, and eggs. At times, but not for seven or eight years before his death, he worked for appellant, and was paid wages without deduction for his board or care. He was possessed of some money invested at interest. He left a will, which was probated, in which he disposed of his property to persons other than the appellant and his wife. He makes reference to them in the third item of his will, which reads as follows:

"To my children, William Van Dyke and Mrs. Harm Weessies, I leave nothing, because for a long time they have been very unkind to me. I have thought this matter over carefully and feel that they deserve no part or portion of my property."

This will was made July 14, 1900. It is the testimony of appellant's wife that some 16 or 18 years before his death appellant told the deceased that he was not able to care for him unless he paid something for his board; that the deceased, without saying very much, did say that he was able to pay for everything he got. Upon another occasion, when appellant's wife carried a meal to him at his house, he gave her 75 cents, and said: "Here is your board." She took it and gave it to her husband. He asked her what it was for and she said: "Board from father." Appellant said: "You take that back, and tell him I don't want that. That ain't enough." She did so. Decedent took the money, and put it in his pocketbook, saying nothing. This occurred some 12 or 13 years before his death. The executor of the estate, who was also made a legatee, testified that decedent came to him one day, and wanted to know how much appellant owed in the way of a mortgage, was told that he could not tell him, when he went away. The next day he came again, repeated the inquiry, and was told to go to Mr. Osborn who had charge of the mortgages, and he could tell him about it. Mr. James W. Osborn testified that some time

in 1901 or 1902 ( it will be noticed that this was after the decedent had made his will ) decedent came to his office and inquired if there were any mortgages there against appellant, was asked why he wanted to know, and said that Walter Hoek ( his executor ) sent him there.

" He said that he had lived in with Weessies for years, and that he wished to pay him for it, and it was with a view of ascertaining what Weessies owed that he wished to provide for—to assist Weessies. He said that Weessies was a man in poor health, that they had much sickness, and that Weessies was not as strong a man as he was when he was young. I then took the mortgages and prepared a statement of the amount that was owing on them. * * * I showed the mortgages to Mr. Van Dyke. * * * He had the amount of these mortgages; the balance of interest computed up to that time. I handed that to the old gentleman because he told me what use he desired to make of it. He said that he had boarded there, and that he wanted to pay them."

I have here set out, in substance, the testimony and the circumstances relied upon by the appellant. He never presented a bill to deceased, or, so far as is disclosed, asked him to pay or asserted a claim. Deceased never paid him anything. It is clear that the deceased and the appellant and his wife were not for many years living together as a family, receiving mutual benefit and comfort from property which they enjoyed in common. On the contrary, deceased had withdrawn himself from the family, and, while he lived upon the immediate premises, and so close to the house of appellant that, when it was necessary, he could, as he did, attract attention by rapping on the window of his own house, he lived separate and was furnished his meals, and accepted the care and attention of appellant and his wife and children in his separate domicile. The law will not imply from the discharge by a child of a purely filial duty an obligation of the parent to pay for the service. And, when the family relation exists, much which is done for and furnished to a member of the family by another or by other members is presumed

to be gratuitously done or furnished. It is the relation, and the presumption arising therefrom, which is held to negative the existence of an implied contract to pay for what is accepted. See *Decker* v. *Kanous' Estate*, 129 Mich. 146 (88 N. W. 398), and cases referred to in the opinion; *In re Colburn's Estate*, 153 Mich. 206 (116 N. W. 986, 126 Am. St. Rep. 479); *Hialey* v. *Hialey's Estate*, 157 Mich. 45 (121 N. W. 465). But, under the circumstances disclosed by this record, there is, in my opinion, no conclusive presumption that the appellant was furnishing deceased his board gratuitously. It became a question of fact whether deceased and appellant understood that compensation was to be made. *Ashley* v. *Smith's Estate*, 152 Mich. 197 (115 N. W. 1052). It may be that some distinction should be made between the items set forth in the account presented against the estate —between the cost of the sustenance actually furnished to, and accepted by, deceased at the expense of claimant and some of the care bestowed by his wife, the daughter of deceased, upon her father. As a new trial must be had, it is unnecessary to anticipate the instructions proper to be given upon this subject.

It is contended that by the provisions of Act No. 30, Pub. Acts 1903, the testimony of claimant's wife was incompetent. The provision relied upon is understood to be the following:

"No person who shall have acted as an agent in the making or continuing of a contract with any person who may have died, shall be a competent witness in any suit involving such contract, as to matters occurring prior to the death of such decedent, on behalf of the principal to such contract," etc.

There is nothing in the record tending to prove that the wife or claimant acted in any capacity in making or continuing a contract with the deceased. She overheard a conversation between the parties and testified to it. She carried money and a message from her father to her husband, and returned the money and a message to her father.

She testified to the occurrence. The fact that she may have cooked some or all of the food furnished by her husband and delivered some or all of it to her father does not constitute her the agent of her husband within the meaning of this statute.

The judgment of the circuit court is reversed, and a new trial granted, with costs against the estate.

BLAIR, C. J., MONTGOMERY, HOOKER, and BROOKE, JJ., concurred.