## In re VAN DYKE'S ESTATE.

### QUILLAN v. VAN DYKE'S ESTATE.

1. Estates of Decedents—Claims for Services—Contracts—Executors and Administrators.
    Evidence examined, and *held*, insufficient to submit to a jury claimant's claim for services rendered in caring for decedent upon an express contract to pay claimant $1,000.

2. Witnesses—Husband and Wife—Statutes—Estates of Decedents.
    By the statute excluding testimony of an agent of the moving party when the facts so stated are equally within the knowledge of deceased (3 Comp. Laws, § 10212; Act No. 30, Pub. Acts 1903), the testimony of claimant's husband was barred where it tended to show that he represented his wife, in arranging with decedent to come and live with her; nor was the testimony admissible to corroborate other evidence of the arrangement made by them.

Error to Kent; Cogger, J., presiding.   Submitted April 11, 1912.   (Docket No. 112.)   Decided July 11, 1912.

Agnes Quillan presented a claim against the estate of
Ann Van Dyke, deceased, which was disallowed in part
by the commissioners on claims. Claimant appealed to
the circuit court; a judgment for defendant on a verdict
directed by the court is reviewed by claimant on writ of
error. Affirmed.

*E. A. Maher,* for appellant.

*Hatch, McAllister & Raymond,* for appellee.

OSTRANDER, J. Claimant and appellant appealed from
the decision of commissioners on claims in the matter of
the estate of Ann Van Dyke, deceased, and in the circuit
court a verdict in favor of the estate was directed by the
court. Judgment was entered on the verdict. The claim
presented is:

"For services in moving said Ann Van Dyke from
Grand Rapids to Parnell; cleaning and moving the
household effects of said Ann Van Dyke from Grand
Rapids to Parnell; boarding said Ann Van Dyke; pro-
viding her with provisions and fuel, and giving her per-
sonal care and attention July 15th, 1903, to January 1,
1904, $1,000."

In the brief for claimant it is stated:

"The claimant's demand in this case is for the sum of
$1,000 as an amount promised to her by the decedent,
Ann Van Dyke, as consideration for claimant's under-
taking to care and provide for and caring and providing
for decedent as long as she lived."

In directing the verdict the trial judge said:

"The claimant is not seeking to recover the value of
the services rendered, but it is on an express contract.   *
*   *   I think there is a total failure of proof to show any
express contract on the part of the deceased which was
acted on by the claimant, and no evidence showing, or
tending to show, that the mind of deceased and the mind
of the claimant came together on that proposition."

If there was testimony for claimant (none was offered
on the part of the estate) tending to prove, on the one

hand, an agreement to pay claimant $1,000 for the services to be rendered, and, on the other hand, an agreement on the part of claimant to perform the services for $1,000, then it was error to direct a verdict in favor of the estate.

The claimant is a niece of the deceased. She is living with her husband in Vergennes township, about three miles from Parnell, in Grattan township, in the same county. Ann Van Dyke lived in the city of Grand Rapids, was more than 80 years old, a communicant in the Catholic Church, and had once lived in Parnell. The testimony tends to prove that she was somewhat infirm. She communicated her desire to return to Parnell to a niece, not the claimant, saying she wanted to go there, get a house, and be near the church. This niece communicated her desire to claimant, who arranged with her husband to see Mrs. Van Dyke, and he did see her. Mrs. Van Dyke moved, or was moved, in July or August, 1903, first to the home of claimant, where she remained about two weeks. She then occupied a room in a house in Parnell, where she lived alone, and where she died January 2, 1904. There is testimony tending to prove that claimant examined, cleaned, and repaired the belongings of the deceased, cleaned and arranged her room at Parnell, carried provisions to her there, visited her about once a week, doing her washing, which she took to her home. The husband of claimant hauled wood for her, splitting it and carrying it to her room. A daughter of claimant, 17 years old when the cause was tried at the circuit in May, 1911, testified that she heard deceased say to witness' grandmother, a few days after deceased left Grand Rapids—

" That my mother was working hard and cleaning her things up for her to move them up to Parnell, and that she was going to give her $1,000 to pay for it. She said that she would give my mother $1,000 for taking care of her the rest of her life and for moving her to Parnell, and taking care of her the rest of her life, and providing for her. She said, if she ever became too feeble to take care of herself, she was coming back to live with my mother."

On cross-examination she testified:

"*Q*. Did she tell your grandmother when she was going to leave that $1,000 to your mother?

"*A*. When she got through with it herself.

"*Q*. When she died?

"*A*. Yes, sir.

"*Q*. That is, if she had enough money left when she died she was going to leave your mother $1,000?

"*A*. Yes, sir.

"*Q*. Is not that what she said?

"*A*. Yes, sir.

"*Q*. But she did not say how she was going to leave it, or whom she was going to leave it with?

"*A*. Not while I was around.

"*Q*. And she thought your mother had been very kind to her?

"*A*. Yes, sir.

"*Q*. Did she say that?

"*A*. Yes, sir.

"*Q*. For her kindness and feeling toward her that she was going to leave this $1,000 to her?

"*A*. Yes; and for the work she had done.

"*Q*. And for the kindness?

"*A*. And for the work that she was to do the rest of her life.

"*Q*. And for her kindness?

"*A*. Yes, sir.

"*Q*. And that when she died that she was going to leave her $1,000?

"*A*. Yes, sir.

"*Q*. But she did not say whether she was going to leave it by will, or with Father Byrne, or how she was going to do with it?

"*A*. Not in my hearing.

"*Q*. Did she say as to whom else she was going to leave any money to?

"*A*. Yes, sir.

"*Q*. How?

"*A*. Yes, sir.

"*Q*. Now, who else did she say she was going to leave any money to?

"*A*. To the Little Sisters of the Poor.

"*Q*. How much did she say she was going to leave to the Little Sisters of the Poor?

"*A*. About $200.

"*Q*. And who else was she going to leave some to ?

"*A*. She was going to leave Father Byrne $500 to read masses.

"*Q*. Five hundred dollars to Father Byrne to read masses, and who else ?

"*A*. She was going to give her niece and nephew, James and Marie Manzer, some. She didn't mention any amount.

"*Q*. James and Mary Manzer ?

"*A*. Yes, sir.

"*Q*. She was going to leave them some ?

"*A*. Yes, sir.

"*Q*. Who else was she going to leave any to ?

"*A*. My mother.

"*Q*. And she was going to leave your mother how much ?

"*A*. One thousand dollars."

No other witness testified to the purpose or intention of deceased in the premises, excepting the husband of claimant. He testified that in going to Mrs. Van Dyke at Grand Rapids, and talking with her concerning her removal to Parnell, and in learning her wishes, he was representing his wife, was sent by her, and was her agent. In offering the husband's testimony, counsel for claimant stated that it was not offered to establish a contract, but as corroborative of other evidence relative to the contract. I see no force in the distinction made by counsel. If, as agent of his wife, he had made a contract with Mrs. Van Dyke, the contract could not be proved by his testimony. 3 Comp. Laws, §. 10212, as amended by Act No. 30, Pub. Acts 1903.

But whether he was or was not the agent of his wife, it is not apparent, and it is not explained how claimant could, out of her own resources, care and provide for Mrs. Van Dyke as long as she lived. The husband testified that the work of moving Mrs. Van Dyke and caring for her things, which he did, he did for his wife; that nothing was said about paying him for what he did for wood and kindling, pork, etc., which he furnished. "I told her I was doing them for my wife," is his testimony. "My

wife took bread and cake and pie, chickens, butter, eggs, and potatoes." Who furnished them? The record does not inform us. The facts distinguish the instant case and *Weessies* v. *Van Dyke's Estate*, 159 Mich. 180 (123 N. W. 608), upon this point. The husband's testimony, in so far as it related to or was corroborative of the contract asserted, should have been excluded upon the authority of *Stackable* v. *Stackable's Estate*, 65 Mich. 515 (32 N. W. 808); *Finn* v. *Sowders' Estate*, 139 Mich. 623 (103 N. W. 177). The testimony of the husband, however, amounts to this: That Mrs. Van Dyke said she was going to pay claimant well for the work she was doing for her, and would leave the money with Father Byrne to pay her all in one lump sum after her death. And—

"She said, if she became too feeble to live there, she wanted Agnes to take her back to her own home—Mrs. Quillan's. She said that she was becoming so feeble that she was not able to take care of herself where she was in the rooms at the corner on South Division street any more, and she said that, if Mrs. Quillan did not move her out from there, she would have to go to the Sisters, and there she would have to give all her money to them, and she would prefer to give it to Agnes if she would undertake this."

With reference to another conversation he had with Mrs. Van Dyke, he testified:

"She said she would like to come up and live with Agnes and have her take care of her, as she was better pleased with her cooking and method of housekeeping and getting along, and that she would obtain better care than other places, at the Sisters of the Poor or any other place. Mrs. Van Dyke was a person of good appetite. She was short, quite chunked, corpulent. She asked me to have Agnes come down to see her, and they would make an arrangement to see what they would do. I told her I would do so, and would bring Agnes downtown. Agnes called there about three weeks afterwards. She didn't go before that time, because Mrs. Van Dyke said she wanted to remain in Grand Rapids until after the dedication of the St. Andrew Cathedral; then she would go up. That was to be dedicated on the 4th of July, 1903. Agnes went

there about two weeks after that.    I accompanied her.    I did not hear any conversation between Agnes and Mrs. Van Dyke relative to Mrs. Van Dyke going to live at Parnell."

Claimant is not seeking to recover what her services were worth.    I find no testimony tending to prove an agreement to care and provide for Ann Van Dyke, as long as she lived, for $1,000.

The judgment is therefore affirmed.

MOORE, C. J., and STEERE, McALVAY, BROOKE, and STONE, JJ., concurred.    BLAIR and BIRD, JJ., did not sit.